Mr. Kwiat, is that right? Your Honor, it's Kwiat. Kwiat, okay. Good morning. Good morning, sir. My name is Michael Kwiat. I represent Ken Baker, the appellant. I do respectfully ask for three minutes to be reserved. Okay. I don't understand what happened with the policy. We've got a policy with 28 pages, a summary judgment, and then Mr. Lesnick says, well, that's the policy that sold this guy. And then Sunlife comes in and goes, oh, wait, wait, wait, wait, wait, there's two more pages. Yeah, they're not in the table of contents, but they're not numbered. Yeah, they're pages 29 and 30. Yeah, coincidentally. And there's no issue of fact about what the heck the contract is. How unworthy can that possibly be? I don't know, Judge. Okay, you're right about it. I've got a similar question to yours. But you know what the question is. You know my pitch, and I'll say it in a row. If we agree with you on that issue that there's an issue of fact there, two affidavits that say the opposite thing, do we need to go any further? Well, Judge, respectfully. You're focusing on need there. I was going to say need. If Your Honor is telling me that that's the outcome, I'll sit down. No, we're talking about the outcome. We're just asking you. It's an interesting question. Obviously, that would put the case back in a position where we readdress this issue. But I guess a more compelling question, at least in my mind, because I do some of this kind of work, is how are we going to juxtapose Rule 56 with ERISA? We're waiting for the Supreme Court to tell us. You know, respectfully, the outcome in this case can't be the way the system is supposed to work. It just cannot be. And I understand that ERISA cases are treated differently, and I recognize that there's authority around the country that suggests that. But at the same time, these cases are civil actions as defined by the statute, and they're civil actions covered by the Federal Rules of Procedure. I haven't seen any authority anywhere that says otherwise, and I understand that the practice suggests otherwise. I don't wear the robe, so it's not for me to say. I'm trying to understand how far can a district court judge go in summarily deciding these cases and still comport with the intent and the purpose behind Rule 56? I think that's a good question. But if the issue had been decided properly, let's assume, by the district court, we might get to that particular point. I'm not sure if you are right on the necessity for fact-finding on construing the agreement as to whether it provides discretion or not that we even get to that question, at least at this stage. The only other point I would make, Your Honor, is this. I know that the defendant has pointed out correctly that at the end of the district court's decision, she indicated that she would have found the same way under a de novo standard for review. It's called the form I used, but that was called the CYA memoir between the file. It was only putting up 44 words at the end. That's correct, Judge. All I'm trying to suggest is that if you're going to draw every inference against the plaintiff, if you're going to make every credibility determination against the plaintiff, if you're going to decide every disputed question of fact against the plaintiff, then I would agree. It wouldn't matter whether the standard of review was de novo or arbitrary and capitious. You're still going to come out the same way. So I just wanted to speak to that because Your Honor asked, is that all we need to decide in this case? It is, as long as we recognize that that footnote doesn't really speak to the issues that we tried to present in our appeal. That said, if the Court has no further questions, I will sit down. Thank you. May it please the Court. Good morning. I represent the defendant of Pelley Sun Life in this case. You know the first question. Maybe you can answer it for me. I can answer that question, Your Honor. The question of the pages that are unnumbered is- You know that old TV show, Name That Tune? I can name that tune. I can answer that question. And I can answer that question. I can give you a lot of answers to that question. The first is, you know, we've cited two other cases involving the identical policy language that has that discretionary language in it, the Ray case from Alabama, the Rice case from Michigan. I understand that we're dealing with this case in which you have Mr. Carr saying that it's added on to the policy that Lesnick, Mr. Lesnick says exists. Lesnick said he sent over a policy that's 28 pages. You're sending over one that has a 29 and 30, which has the language in there that you're looking for, but it's not in the table of contents. How isn't this the classic material issue of fact that's in contest? I'll get to that point, but I need to clarify the facts. It is not numbered 29 and 30. It is not numbered in the Ray case. It is not numbered in the Rice case. The reason being it's included at the end of all policies. Some policies, for example, AD&D policies may have shorter terms, but this is always included at the end as the last two pages because it's the ERISA rights section and describes the ERISA rights. So it's maybe not included in the table of contents, but what we've shown through Mr. Carr's affidavit is that this would have been included, this was included, and there's no reason why in the Ray case and the Rice case without Lesnick. Here's the problem. You've got the district judge saying the Carr affidavit clarifies that the policy delivered to Yankee Payroll included the appropriate discretionary language, in other words, the two additional pages. However, there was no copy of the policy in the administrative record at all, and there's only one affidavit confirming the contents. You know there's another affidavit. It's the Lesnick affidavit. Well, and I can't read into the mind of the judge in what she was thinking at the time. There was something happened, but she overlooked a critical piece of factual statement that is by Mr. Lesnick. I mean, I'm not so sure she did overlook it, but it's hard to, you're right, we don't know. She didn't mention it. I can agree with that. But here's the problem. I would say that Mr. Lesnick's affidavit doesn't even raise an issue of fact because of this. Mr. Lesnick sold the business prior to preparing that affidavit. He doesn't discuss anything that he went through except something that he sent years earlier saying. On September 27, 2011, I faxed Yankee Payroll a 28-page document which included a cover sheet from my office and the 27 pages of the policy here at issue. Does he say, though, that what was delivered did not include those two pages? He never says that. He never says that. He never says that. The 28-page document, 27 pages including the cover sheet, that gets you to 28. And I understand your argument that these two pages are always included, especially the way a fax machine works. The fax machine is going to count those as two additional pages. Your Honor, this is what he sent, Mr. Lesnick sent to Mr. Keogh. But then you've got the car affidavit which is at the top of his date file where it says page 29 of 30, page 30 of 30. Well, not of the document, and I'll tell you, those pages, and it's in the record there, Your Honor, those pages are not numbered in that either. And the addition has no numbers. You know, everything else before that has numbers. Does it not? Part 12. Yes. Part 12, part 13. This is not a part 14. I mean, how in the world can a court of appeals say that, okay, maybe the district judge had an oversight with regard to the Lesnick affidavit. Okay, so we can make a finding of fact? No, we can't do that. I understand, Your Honor. But what I'm saying is that if you look at the Lesnick affidavit, and I'm thinking maybe, and it's speculation, obviously, it's incomplete. It doesn't contain necessary facts. So maybe that's why she's saying, I'm believing the car affidavit because this is one of your rights. Let's assume you're right. It's incomplete. That's not an argument to us, is it? It's a jury argument. Well, here's the question, though. This is an ERISA case. There's no right to a jury trial. He submitted this as a Rule 56 motion for summary judgment. So the court had to make the decision. It wasn't like a jury's going to make the decision. The judge had to say. In fact, the other question, the standard for that decision was 56 versus ERISA. Well, that's a good question, Your Honor, and we've cited it to numerous circuits. I came up with that myself. You wouldn't have him have it if she were here. She's gone. She's gone long enough. Your Honor, every circuit to address this issue has said that the Rule 56 is just the vehicle to get the issue before the court. And what is your alternative? Rule 52, as counsel says, well, this court's already addressed that, and I'm looking at the two judges now who said it. That was in the Lasser case versus Reliance Standard. Judge Ambrose, Judge Sirica, you were on the panel, and I was counsel for the defendant in that case. And one of the issues was that the district court held or decided the case under Rule 52, and this court said it was improper. It's improper. Why? Because this is an ERISA case, and under arbitrary and capricious review, the only question is whether the defendant's decision is reasonable. Now, if you're putting inferences in favor of a claimant, that's the opposite of giving deference to the defendant. But if you have the language, the discretionary language, that's contained in this addendum that's disputed whether it's actually part of the policy or not, you win. If you don't have that discretionary language, there's another test that's done, and it's a de novo test. And, yes, the court said if it was de novo, I would rule the other way. But it's kind of funky for us to say a 44-word footnote 7 at the tail end of an opinion decides the whole matter. It's almost like, okay, if I ever got to that, I'd have to cover myself. But you can't do that without some analysis, can you? I think we can get to there. And, Your Honor, Chief Judge McKee, you said that maybe that's a little bit of CYA. And it's funny. I thought the same thing. Well, I didn't quite say CYA. So what I did was I went through every one of Judge Wigginton's opinions that I can find in arrested cases. This is the only one she ever said that. The only one where she ever made that comment. So that wasn't her just making some gratuitous statement that, you know, I would have done it that way, too, under de novo review. She believed that. In fact, she starts out the opinion and she ends the opinion by saying, because there aren't any facts supporting the disability claim. And that's the part that counsel loves that this Court's gone to the procedural issues because there are no facts supporting the disability claim. And that's what she saw. And that's what I'd like to address for a little bit of time. I'm not so sure that that's a summary judgment issue because there are some disputes. The disability, as I understand it, is only a cognitive disability, not a physical disability. You've got the surveillance, but as I read through this, it seems to me what he said is that he told the company he was going to try to see if he could go back to work. So it seems to me like you're damned if you do, you're damned if you don't. If you try to go back to work, you've got surveillance following you around for 21 days over a period of time. They see you trying to go back to work and they use that against you. But if you don't try to go back to work, I'm sure your company doesn't want somebody who could do the job just sitting at home collecting disability and not making an effort to go back to work. So it's like it's heads you win, tails you lose, isn't it? Unless you look at what he said. I mean, to me surveillance... The counter, I agree, the counter testimony is troubling and that may well make it a slam dunk for you. You send everyone behind the counter, you've got someone in the company, you've got surveillance following you behind the counter. Tell them what he did there and maybe that can be clarified through examination. But that's a strong point. And he's got a binder in his hand where he's saying... I mean, let's look at what he said. April of 2011... Do you know how many people I see on the street who are totally non-compassmentists, who have binders in their hands? The other day somebody approached me with a briefcase and asked me for a dollar for a cup of coffee. I told him it's going to cost at least $25 if you want a latte and he just kind of walked away. But the fact he has a binder in his hand, I'm not sure that means an awful lot. Well, you're going to have to remember that trick, Your Honor, if you don't. Somebody asked, but... There's a guy at Instant Market, he'll leave you alone if you tell him. A latte is $3.25. But let's look at it. You said that he's not claiming it on the physical, but he did. He did claim it. He told my client that he's physically disabled. His doctors, Dr. Gumprecht, said that he had a Class 5 physical disability, meaning he was incapable of even minimal work. That comment was made in April 2011 when all this surveillance took place. Okay, I thought we got beyond that, though. There was some recovery, and now we're talking about cognitive disability. Well, but I just want to say, the same doctor said he had cognitive disability. So if Dr. Gumprecht is saying he's got severe physical limitations, that he can't even do minimal activities, and Dr. Gorefine is saying that he's got all these physical ailments and he can't even walk without gait impairment, and they're not only belied by the surveillance, they're unsupported anywhere else in the record. There's no treatment for them. And the same doctors are saying, and he also has a cognitive impairment, you can't believe those doctors, especially, by the way. My client then has a doctor who calls them and says, I'd like to discuss your opinions because there are inconsistencies here. And his own experts refuse to call back. They refuse to talk to my client. We're supposed to investigate a claim, and they won't participate. So now their opinion is… My spouse lives and dies by HIPAA. That doesn't surprise me at least because of… No, no. Our doctor tried to talk to them. Your doctor tried to talk to them. Our doctor tried to talk to them. So it was doctor to doctor, and they wouldn't cooperate. Well, but that also… People get nervous about that. He had a HIPAA release. He provided us. We gave it to the doctors. So they knew we had it right. Now, let's look at the cognitive, though, because what do we have? What do we have? We have one examination by Dr. Carnival, which everybody admits did not have validity testing, which is necessary. That's it. But the same doctor said, neuropsychologist Dr. Carnival said, Hey, look, if you're having these cognitive issues, as serious as you're saying, you should undergo some cognitive therapy for it. You should undergo some sort of treatment. And he never did. So here's a guy who's out of the claim. He's been on disability since 2008. We're now at 2010, 11, 12. And he still has not had any treatment. The only thing he did is get incomplete testing by one person. Then you look at what's he relying on. He's actually relying on Dr. Barr, who's our doctor's test results. And Dr. Barr, the neuropsychologist, said, you know, all right, on three tests, there are below average scores on this. But he administers a battery of 37 tests. Thirty-seven. He's the neuropsychologist. He knows that you have to look at all of it, and you have to weigh the tests before you can reach an opinion, because there are inconsistencies there in that testing. So counsel says, Aha, look at these three out of 37 support the claim, but not according to the doctor who performed that testing. And counsel's not an expert. And we know this because his own expert, Dr. Freundlich, who was hired by Mr. Baker, not to offer an opinion on impairment. That's the other surprising thing. He only said, Criticize Dr. Barr. Look at the testing and criticize Dr. Barr. He even said the score on the one test where there's a 25-point drop that counsel relies on to show impairment, he can't explain it. He said, That's surprising. In a matter of three months. You put that in context, though. The surprising is in a paragraph in the subparagraph that puts the adverb surprising in some context. His comment can only be read in the context of, That's surprising to me that there would be such a drop in four months. That is the context of it, Your Honor. So, you know, and then we also have Dr. Ross, who's a neuropsychologist. She looked it over, too, and she agrees with Dr. Barr and said that this is not a substantiated here. Again, the scores, the testing does substantiate impairment, and no treatment. There's no treatment for it. I'd also like to point out this. Dr. Ross reached out to Dr. Carnival to get his test score, his raw data, and Dr. Carnival promised to provide it, and then he never did. So this is another doctor, a third doctor. Now, there's got to be consequences to a claimant when a doctor, their own treating doctors, refuse to provide information that's necessary to decide a claim. And because I'm sure he'll mention this in rebuttal, I just want to point out the comments about Dr. Barr. Go ahead. Well, I thought those were offensive. They were uncalled for. They called Dr. Barr a hired gun. He's basically called an insurance defense expert. He's a lot more than that. He is an assistant professor at NYU Medical School. I don't know the man, although I understand others have taken up that mantra. His credentials are impeccable. Well, he's not attacking his credentials. He's attacking his fairness and his neutrality. Well, okay, but we've also pointed to cases where he's testified on behalf of criminal defendants showing that there was impairment. We've shown that in a Social Security case that he testified for a claimant showing that there's an impairment. So to call him an insurance defense expert, that's just uncalled for. It's unsupported. I point out we cite to this case Topiano in which another district court judge in New York said that counsel's arguments regarding the facts of the claim and the experts were untethered to facts. I think the same thing could be said here. But going back to the initial point about even under de novo review, the court's comments, the conclusions are fully supported. Where is the treatment for cognitive? If I may finish the thought here, we had so much time in which he could have sought some treatment. And what did counsel say in his brief? He said, we should have provided it. That's not our burden. And he knew this was an issue. So if those records did exist, he would have provided them. The fact is, how can he claim a disability based on cognitive impairment when there's no treatment going on except for one partial testing? So what would happen even under de novo review? Well, the judge, there's no jury trial. We know that. So what difference would it make? The judge is still going to make findings of fact, which she did, and those will be reviewed under the clearly erroneous standard. So now he's in a worse situation, I think, than before, because under the arbitrary and capricious standard, your Honor sitting here can look at that and say, all right, we take a de novo look at the evidence and decide whether it was arbitrary and capricious. So the fact of the matter is the standard of review doesn't matter in this case because there is no evidence, and the judge recognized that. And we ask that the court therefore affirm the decision. Thank you, Mr. Baker. Thank you very much. Mr. Kui, are you using some time, I believe? Just briefly, Your Honor. It's difficult to understand how the standard of review could not matter in how this case comes out. But be that as it may, with regard to the lack of cognitive therapy, Dr. Carnevale said in his report his cognitive impairments were permanent. He suggested that he get therapy. Those are facts. At no point thereafter was that ever followed up by anyone, including Sun Life. It wouldn't have changed the permanent nature of his impairments. But the reality is, in this record, there's no evidence that he didn't have the therapy. Nobody ever asked him if he had the therapy. If this goes back, it really has to be analyzed under the de novo standard, and if the court continues with what it said in footnote 7, you'd probably lose, but the court would have to give some reasoning. Yeah. I'm sorry. The court would have to give more reasoning. Yes. Yes. No, I agree. If that's the way the court's going to interpret the evidence, it wouldn't matter for this district court, whether it was de novo or arbitrary increases, because she's clearly made up her mind about the evidence. But aside from that, with regard to the raw data and the fact that they say Dr. Carnevale never produced it, they already had the raw data, their own Dr. Peer had the raw data. He confirmed that he had the raw data. He never shared it, apparently, with Dr. Ross, but he had the raw data all along, and to suggest that somehow that was withheld is absolutely inaccurate, given the state of the record. Finally, with respect to the question of the policies that this company generates, quote, always having these addenda, I don't know where that comes from. I don't know what the basis for that assertion is. It's certainly not anything in the record. It's certainly not anything that even Mr. Carr said. Mr. Carr talked about this policy, how he knew about this policy, as opposed to all others. We don't know. But I guess the point being there's no evidence in the record to support that argument. It's pure speculation. Simply because they were found to have discretion in other cases, they must have it in this case. I don't see it, judges, and I don't think it's in the record. Thank you. Thank you very much. I'll take the matter under review. Mr. Carr, you remind me of someone from left me. I can't think who it is. Have people told you you remind them of X or Y or Z? Depends on who you ask. Don't ask Josh. Okay, thank you. Thank you. Thank you very much.